UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o U.S. Attorney's Office for D.C.
601 D Street, NW
Washington, DC 20530,

        Plaintiff,

    v.

8,911 "TYPE 56-1" ASSAULT RIFLES;

35 "AKS-74U" ASSAULT RIFLES;

298 "AKS20U" CARBINE RIFLES;

19 "TYPE 80" GENERAL PURPOSE
MACHINE GUNS;

265 "PKM"-PATTERN GENERAL
PURPOSE MACHINE GUNS;

100 "TYPE 85" SNIPER RIFLES;

52 "AM-50" ANTI-MATERIEL RIFLES;

194 (APPROXIMATE) "RPG-7"-TYPE
ROCKET LAUNCHERS;

50 ANTI-TANK GUIDED MISSILES ("AT-4
FAGOT" AND "AT-5 KONKURS"
VARIANTS);

23 "DELAVIEH" ANTI-TANK GUIDED
MISSILES;

     - and -

798,400 ROUNDS OF 7.62x54MMR
AMMUNITION

        Defendants.

Civ. A. No. 23-cv-1951

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff the United States of America (the "United States"), by and through the United States Attorney for the District of Columbia, alleges as follows and brings this verified complaint for forfeiture *in rem* against the "Defendant Properties," which collectively consist of:

i.      Approximately 8,911 "Type 56-1" Assault Rifles ("Defendant Property 1");

ii.     Approximately 35 "AKS-74U" Assault Rifles ("Defendant Property 2");

iii.    Approximately 298 "AKS20U" Carbine Rifles ("Defendant Property 3");

iv.     Approximately 19 "Type 80" General Purpose Machine Guns ("GPMGs") ("Defendant Property 4");

v.      Approximately 265 "PKM"-Pattern GPMGs ("Defendant Property 5");

vi.     Approximately 100 "Type 85" Sniper Rifles ("Defendant Property 6");

vii.    Approximately 52 "AM-50" Anti-Materiel Rifles ("Defendant Property 7");

viii.   Approximately 194 "RPG-7"-Type Rocket Launchers ("Defendant Property 8");

ix.     Approximately 50 Anti-Tank Guided Missiles ("ATGMs") ("AT-4 FAGOT" and "AT-5 KONKURS" Variants) ("Defendant Property 9");

x.      Approximately 23 "DELAVIEH" ATGMs ("Defendant Property 10"); and

xi.     Approximately 798,400 Rounds of 7.62x54mmR Ammunition ("Defendant Property 11").

## NATURE OF ACTION AND THE DEFENDANT IN REM

1.      This *in rem* forfeiture action arises out of an investigation by Homeland Security Investigations ("HSI") and the Defense Criminal Investigative Service ("DCIS"). Specifically, the United States is investigating an Iranian maritime weapons smuggling network involved in the illicit trafficking of lethal weapons and related munitions and supplies by sanctioned Iranian

entities that directly supports military action by the Houthi movement in Yemen and the Iranian

regime's campaign supporting terrorist activities in Yemen and throughout the region.

2.      The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C.

§ 981(a)(1)(G)(i) as "foreign or domestic" assets of a designated foreign terrorist organization, the

Islamic Revolutionary Guard Corps ("IRGC"), which is and has "engaged in planning or

perpetrating" federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) "against the United

States, citizens or residents of the United States, or their property, and [as] assets, foreign or

domestic, affording any person a source of influence over . . . such entity or organization." 18

U.S.C. § 981(a)(1)(G)(i).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.      Pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b), this court has jurisdiction

for property subject to forfeiture on the high seas.

5.      Venue is proper within this judicial district pursuant to 28 U.S.C. §§ 1355(b)(1)(A)

and (b)(2).

## FACTS GIVING RISE TO FORFEITURE

I.      **BACKGROUND**

    A.      **Iranian Support of Military Action and Terrorist Activity in Yemen**

6.      According to open-source reporting, the Houthi movement, a rebel faction that has

been fighting the United Nations ("U.N.")-recognized government in Yemen, took control of the

Yemeni capital, Sana'a, in 2014. In response to Houthi movement advances, neighboring states

launched a military campaign in 2015. Iran's regime is widely known to provide support to the

Houthi movement. Yemeni officials and their allies, most notably the Kingdom of Saudi Arabia,

have repeatedly and publicly alleged that Iran and its proxy, Hezbollah, have provided arms,

training, and financial support to the Houthi movement. Iranian and Hezbollah officials have denied such claims.

7.      In January 2020, 2021, 2022, and 2023 the U.N. Security Council published annual reports on Yemen (hereinafter referred to as "2020 Panel Report," "2021 Panel Report," "2022 Panel Report," and "2023 Panel Report," respectively) (collectively, "Panel Reports") regarding their findings on the ongoing conflict between the Houthi movement and the U.N.-recognized Yemeni government.

8.      Regarding potential violations of the targeted U.N. arms embargo, the Panel Reports noted the continued reception by Houthi movement forces of military support in the form of assault rifles, rocket-propelled grenade launchers, anti-tank guided missiles, and sophisticated cruise missile systems. Information conveyed through the Panel Reports has revealed a repeated practice of Iran providing military support, particularly in the form of conventional weapons and munitions, to the Houthi movement.

9.      The 2021 Panel Report scoped the ongoing activity in Yemen for the timeframe of January 1, 2020, through December 5, 2020. As to potential violations of the targeted U.N. arms embargo, the 2021 Panel Report noted two instances whereby lethal military aid, believed to be intended for Houthi movement forces, was intercepted by way of maritime transit.

10.     These two interdictions were made against the dhows *Al-Shimasi* and *Bari-2* by the Saudi Royal Navy on or about April 17, 2020, and June 24, 2020, respectively. The interdiction of the *Al-Shimasi* resulted in a seizure which consisted of what was described in the 2021 Panel Report as 3,002 Kalashnikov-type model "56-1" assault rifles and 4,953 matching cartridge boxes, nine "AM-50 Sayyad" anti-materiel rifles, 49 PK-type light machine guns, and over a dozen RU90G and RU120G thermal weapons sights. The interdiction of the *Bari-2* resulted in a seizure

which included 1,298 Kalashnikov-type model 56-1 assault rifles, 200 RPG-7 launchers, 50 AM-50 Sayyad anti-materiel rifles, five RPG-29 launchers, 385 "PK"-pattern light machine guns, 60 heavy machine guns, and 21 9M133-type anti-tank guided missile launch containers.

11.      The 2021 Panel Report noted that a review conducted of the weapons seized from the *Al-Shimasi* and *Bari-2* assessed that many originated in Iran. For example, the seized 9M133-type anti-tank guided missile launch containers were found to contain materials, colors, and markings consistent with the Dehlavieh-version missile that is manufactured in Iran, as opposed to the original version manufactured in the Russian Federation. The panel further noted that the RU90G and RU120G thermal weapons sights were of Iranian origin and manufactured by the company Rayan Roshd Afzar, an Iran-based defense company. The 2021 Panel Report further concluded that the seized RPG-7 launchers bore markings and technical characteristics that were consistent with manufacturing in Iran and that the seized AM-50 Sayyad anti-materiel sniper rifles were also of Iranian origin.

12.      Regarding the *Bari-2*, the 2021 Panel Report noted that a review of a GPS receiver found on the vessel indicated that it was headed towards a rendezvous point off the Somali coast, and further, that documents and coordinates from the GPS receiver indicated the vessel had previously sailed between ports in Somalia, Yemen, and Iran. The panel additionally assessed that the *Bari-2* was likely acting at the time as a "feeder" vessel for smaller Yemeni dhows that carry the cargo from the Somali coast to Yemeni ports in and around Hadramawt and Mahrah.

13.      The following year, the 2022 Panel Report noted the continued reception by Houthi movement forces of lethal military aid. For example, on or about February 10, 2021, U.S. Naval Forces Central Command ("NAVCENT")-directed "safety-of-the-seas" operations conducted by the USS *Winston Churchill* resulted in the encounter and boarding of a dhow vessel in international

waters. This operation resulted in the interdiction of 3,752 Kalashnikov-type model 56-1 assault rifles; 198 "PKM"-pattern general-purpose machine guns; components for 82 "DShK" heavy machine guns; 50 AM-50 Sayyad anti-materiel rifles; and 90 rocket-propelled grenade launchers. The dhow was crewed by Yemeni nationals who stated that they had been instructed to pick up the cargo in the port of Jask in Iran in January 2021. The 2022 Panel Report further determined that the assault rifles and some of the general-purpose machine guns had technical characteristics and markings consistent with weapons manufactured in China, and the anti-material rifles (and associated sights) and the rocket propelled grenade launchers were likely of Iranian origin.

14.     On or about December 20, 2021, a dhow, the *Al-Ghazal I*, crewed by Yemeni nationals, was interdicted in international waters by the United States. According to the 2023 Panel Report, the *Al-Ghazal I* left the port of Jask in Iran and was found to have laden on-board assault rifles and ammunition whose markings were consistent with weapons manufactured in China. Interviews with the crew members further indicated their recruitment by senior leaders of a Yemen-Houthi movement smuggling network.

15.     According to reporting from the U.S. Navy in 2017, a major reorganization of Iranian naval forces began in 2007. This reorganization led to Jask becoming one of four designated naval districts for the Islamic Republic of Iran Navy ("Iranian Navy"). This reporting further indicates that the Iranian Navy shares responsibility with the IRGC Navy ("IRGC Navy") for Iran's naval defense forces, with the chain of command structure for both the Iranian Navy and the IRGC Navy passing through a senior IRGC official.

16.     These interdictions indicate that sea transport continues to play a vital role in potential violations of a targeted U.N. arms embargo. The Panel further noted in this annual reporting that the smuggling networks operating along these supply routes often utilize traditional

cargo vessels, such as dhows, which often operate without proper registration papers and without transmitting an automatic identification signal. These vessels can unload their cargoes in small ports across the region or trans-ship cargo at sea, making them an ideal choice for arms smuggling.

**B.      The Islamic Revolutionary Guard Corps ("IRGC") and Its Affiliates**

17.      The U.S. Department of State and the U.S. Department of the Treasury have found that the Iranian government uses the IRGC, to include its clandestine operations branch known as the Qods Force ("IRGC-QF"), to be the Iranian Government's primary means to protect and defend Iran's hardline Islamic regime. The U.S. Departments of State and the Treasury have found that the IRGC and IRGC-QF direct and implement a global terrorist campaign against nations and regimes to which they deem to be adversarial and provide support and aid to those nations and regimes they deem allied with their goals and principles. The support of this global terrorist campaign includes the illicit trafficking of conventional weapons to proxies in various countries, including the Houthi movement in Yemen.

18.      On April 15, 2019, the United States Secretary of State designated the IRGC as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act. To date, the IRGC remains a designated Foreign Terrorist Organization.[1]

---

[1]      IRGC is also known as Islamic Revolutionary Guards Corps; Islamic Revolution Guards Corps; Iran's Revolutionary Guard Corps; Islamic Revolutionary Corps; IRG; The Iranian Revolutionary Guards; Islamic Revolutionary Guards; Iran's Revolutionary Guards; Revolutionary Guards; Revolutionary Guard; Army of the Guardians of the Islamic Revolution; The Army of the Guardians of the Islamic Revolution; AGIR; Pasdaran; Pasdaran-e Inqilab; Pasdarn-e Enghelab-e Islami; Sepah; Sepah Pasdaran; Sepah-e Pasdaran-e Enghelab-e Eslami; Sepah-e Pasdaran Enghelab Islami; Islamic Revolutionary Guard Corps-Qods Force; IRGC-Quds Force; IRGC-QF; Qods Force; Sepah-e Qods; Jerusalem Force; Al Qods; Islamic Revolutionary Guard Corps (IRGC)-Qods Force; Pasdaran-e Enghelab-e Islami (Pasdaran); Sepah-e Qods (Jerusalem Force); Qods (Jerusalem) Force of the IRGC; Quds Force; IRGC Ground Forces; Islamic Revolution Guards Corps Ground Force; Basij; Baseej; Basij-e Melli; Islamic Revolution Guards Corps Resistance Force; Basij Resistance Forces; Mobilization of the Oppressed; Mobilization of the Oppressed Unit; Mobilization of the Oppressed Organization; Organization of

19.     According to the U.S. Department of the Treasury, the IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion-dollar businesses and maintaining extensive economic interests in various industries, to include the oil and manufacturing sectors. The profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad. *See* https://home.treasury.gov/news/press-releases/sm703. One such recent press release made by the U.S. Department of the Treasury on June 10, 2021, stated, in part:

> Since the onset of the conflict in Yemen, the Houthis have relied on support from the IRGC-QF to wage their campaign against the internationally recognized Yemeni government and the Saudi-led Coalition. Despite growing calls for peace, the Houthis have continued to escalate their lethal attacks inside Yemen and in the region, with dire consequences for Yemeni civilians and Yemen's neighbors.

https://home.treasury.gov/news/press-releases/jy0221.

20.     In furthering its activities, the IRGC and IRGC-QF also rely heavily on support roles presented by various Iranian-based governmental entities, to include the Ministry of Defense and Armed Forces Logistics ("MODAFL"). The Iranian Government set up MODAFL in 1989 with the purpose of creating a unified structure for Iran's defense industries and to effectively utilizing this structure to equip Iran's armed forces through military research and development, production, acquisition, and personnel support. As of 2020, there were approximately seven key

---

the Mobilisation of the Oppressed; Sazman Basij Melli; Sazman-e Moghavemat-e Basij; Sazeman-e Basij-e Mostazafan; Vahed-e Basij-e Mostazafeen; Vahed-e Basij Mostaza'feen; National Mobilization Organization; National Resistance Mobilization; Resistance Mobilization Force; Nirooye Moghavemate Basij; Niruyeh Moghavemat Basij; IRGC Air Force; Islamic Revolution Guards Corps Air Force; Islamic Revolutionary Guards Corps Air Force; Islamic Revolutionary Guard Corps Air Force; IRGCAF; Sepah Pasdaran Air Force; Air Force, IRGC (Pasdaran); Islamic Revolutionary Guards Corps Aerospace Force; Aerospace Force of the Army of the Guardians of the Islamic Revolution; AFAGIR; Aerospace Division of IRGC; IRGC Aerospace Force; IRGCASF; IRGC Navy; Islamic Revolution Guards Corps Naval Force.

defense industries that were subordinate to MODAFL. These key subordinates to MODAFL include, among others, the Defense Industries Organization.

21.     In or around March 2007, the U.S. Department of Treasury initially designated MODAFL and the Defense Industries Organization under Executive Order 13,382 for "engaging in activities that have materially contributed to the development of Iran's nuclear and missile programs."

22.     In or around March 2019, the U.S. Department of Treasury further tightened their sanctioning efforts against MODAFL by designating the organization pursuant to Executive Order 13,224, more specifically for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF. A press release made by the U.S. Department of the Treasury during that time with respect to MODAFL and its support to terrorism and other collaborators stated, in part:

> We are targeting a vast network of front companies and individuals located in Iran, Turkey, and the UAE to disrupt a scheme the Iranian regime has used to illicitly move more than a billion dollars in funds . . . the IRGC, MODAFL, and other malign actors in Iran continue to exploit the international financial system to evade sanctions, while the regime funds terrorism and other destabilizing activities across the region.

https://home.treasury.gov/news/press-releases/sm639.

23.     The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States. The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

        a.      In likely retaliation for the death of former IRGC-QF commander Qasem Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed plot to commit murder-for-hire and provide material support to a transnational murder plot

targeting former National Security Advisor John Bolton, https://www.justice.gov/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

b.      In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/.

c.      In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010). IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack. *Id.*

24.      Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and foreign. Indeed, a key purpose of the IRGC and IRGC-QF's campaigns of terror are to thwart the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries. *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States"). These terrorist activities undertaken in foreign commerce plainly have a domestic effect on the United States.

II.    **UNITED STATES MARITIME INTERDICTIONS OF STATELESS VESSELS CONTAINING CONVENTIONAL WEAPONS AND MUNITIONS FOR CONVENTIONAL WEAPONS ORIGINATING FROM IRAN AND DESTINED FOR YEMEN**

25.    This civil forfeiture action arises from four NAVCENT interdictions of stateless dhow vessels (i.e., dhows not displaying a national flag): two from 2021 and two more from 2023. These four interdictions were initiated in accordance with international law and through routine maritime security operations conducted in and around the Gulf of Oman and the Arabian Sea. These interdictions involved the USS *Tempest* on or about December 20, 2021; the USS *Monterey* on or about May 6, 2021; the USS *Chinook* on or about January 6, 2023; and the USS *Perry* on or about January 15, 2023. Respectively, these four interdictions involved a stateless dhow vessel named the *Al-Ghazal 1* and three stateless unnamed dhow vessels (hereinafter "*DHOW X*", "*DHOW Y*", and "*DHOW Z*").

26.    These interdictions led to the discovery and seizure of four large caches of conventional weapons, including long arms and anti-tank missiles, and related munitions – all of which were determined to be primarily of either Iranian, Chinese, or Russian origin.

27.    An official at the U.S. Department of Defense, U.S. Central Command ("CENTCOM"), whose duties, responsibilities, and expertise include analyzing the activities of the IRGC and their involvement in Yemen, concluded that, for all four seizures:

> [T]here is no plausible way these weapons and munitions could have gotten onto the vessels between Iran and Yemen except that the Islamic Revolutionary Guard Corps (IRGC) has continued a pattern of smuggling lethal aid to Houthi forces in Yemen. All four vessels visited known IRGC Naval ports, and traveled routes consistent with previous IRGC smuggling operations. These seizures reflect that the IRGC continues to attempt to deliver lethal aid and support Houthi forces in Yemen, despite the embargoes directed in United Nations Security Council Resolution (USCR) 2216 and renewed in UNSCR 2675 (Embargo of arms deliveries to Houthi forces).

A.      **Defendant Properties Seized from the *Al-Ghazal 1***

28.      According to CENTCOM, the interception of the stateless *Al-Ghazal 1* was initiated by the USS *Tempest* in the northern part of the Arabian Sea on or about December 20, 2021. In accordance with international law and routine maritime security operations, a security team from the USS *Tempest* boarded the *Al-Ghazal 1* and discovered a cargo of conventional weapons and ammunition consisting of 1,438 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1; and 220,000 rounds of 7.62x54mmR ammunition, which are identified as a portion of Defendant Property 11.

29.      Information provided by CENTCOM included information taken from a navigational device, which further revealed that the *Al-Ghazal 1* was at the port of Jask, Iran, a known IRGC naval port, on December 17, 2021. Further, the vessel was interdicted along a route consistent with prior IRGC smuggling operations.

30.      According to the 2023 Panel Report, additional information obtained following the interdiction of the *Al-Ghazal 1* revealed the nationality of the crew as being Yemeni. The 2023 Panel Report further noted interviews that were held with the crew members from the *Al-Ghazal 1*. These interviews further revealed the recruitment of these crew members by senior leaders of a Yemen-Houthi movement smuggling network.

B.      **Defendant Properties Seized from Maritime Vessel *DHOW X***

31.      According to CENTCOM, the interception of the stateless, unnamed *DHOW X* was initiated by the USS *Monterey* in the northern part of the Arabian Sea on or about May 6, 2021. In accordance with international law and routine maritime security operations, a security team from the USS *Monterey* boarded *DHOW X* and discovered a cargo of conventional weapons, ammunition, and other munitions consisting of 2,556 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1; 35 "AKS-74U" Russian-made assault

rifles, which are identified as Defendant Property 2; 194 Iranian-made "RPG-7" type rocket launchers, which are identified as Defendant Property 8; 19 Chinese-made "Type 80" GPMGs, which are identified as Defendant Property 4; 164 Iranian-made "PKM"-Pattern GPMGs, which are identified as a portion of Defendant Property 5; 100 Chinese-made "Type 85" sniper rifles, which are identified as a portion of Defendant Property 6; 52 Iranian-made "AM-50" anti-materiel rifles, which are identified as Defendant Property 7; and 50 Russian-made ATGMs further described as variants of the "AT-4 Fagot" and "AT-5 Konkurs" missile systems, which are identified as Defendant Property 9.

32.     Information provided by CENTCOM included information taken from a navigational device at the time of the interdiction, which further revealed that *DHOW X* was at the port of Jask, Iran, a known IRGC naval port, on May 4, 2021. Further, the vessel was interdicted along a route consistent with prior IRGC smuggling operations.

33.     Additional information provided by CENTCOM indicated that the 194 "RPG-7" type rocket launchers, the 164 "PKM"-Pattern GPMGs, and the 52 "AM-50" anti-materiel rifles interdicted from *DHOW X* by the USS *Monterey* were manufactured by Iran's Defense Industries Organization, the U.S. Treasury-designated entity that is linked to the IRGC through MODAFL.

       **C.     Defendant Properties Seized from Maritime Vessel *DHOW Y***

34.     According to CENTCOM, the interception of the stateless, unnamed *DHOW Y* was initiated by the USS *Chinook* in the Gulf of Oman on or about January 6, 2023. In accordance with international law and routine maritime security operations, the USS *Chinook* intercepted the *DHOW Y* in the Gulf of Oman while transiting international waters originating from Iran to Yemen. The vessel was intercepted along a route historically used to traffic illicit cargo to Houthi movement in Yemen. Crew members aboard *DHOW Y* corroborated its Iranian point of origin. As

- 13 -

a result, a security team from the USS *Chinook* boarded *DHOW Y* and discovered a cargo of conventional weapons and ammunition consisting of 1,918 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1; and 198 Russian-made "AKS20U" carbine rifles, which are identified as a portion of Defendant Property 3.

35.     Following the January 6, 2023, interdiction of *DHOW Y* by the USS *Chinook,* an official at NAVCENT, who has expertise in these matters provided a public statement relating to that interdiction indicating "[t]his shipment is part of a continued pattern of destabilizing activity from Iran . . . These threats have our attention. We remain vigilant in detecting any maritime activity that impedes freedom of navigation or compromises regional security." A subsequent statement made by CENTCOM added, "the IRGC was responsible for the weapons being placed on [*DHOW Y*]." With respect to the assault rifles seized, CENTCOM's statement added, "[the weapons] are linked to the IRGC", and further, "[the weapons] were destined for use by Houthi insurgents."

### D.     Defendant Properties Seized from Maritime Vessel *DHOW Z*

36.     According to CENTCOM, the interception of the stateless, unnamed *DHOW Z* was initiated by NAVCENT-allied partner naval forces with the assistance of the USS *Perry* in the Gulf of Oman on or about January 15, 2023. In accordance with international law and routine maritime security operations, U.S. and allied naval forces observed a flagless *DHOW Z* in the Gulf of Oman along routes historically used to traffic weapons unlawfully from Iran to Yemen. A security team from the USS *Perry* assisted in the boarding of *DHOW Z* and a cargo of conventional weapons and ammunition was discovered consisting of 2,999 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1; 100 Russian-made "AKS20U" carbine rifles, which are identified as a portion of Defendant Property 3; 101 mostly Chinese-made "PKM"-Pattern GPMGs, which are identified as a portion of Defendant Property 5; 23 Iranian-

made "Delavieh" ATGMs, which are identified as Defendant Property 10; and 578,400 rounds of

7.62x54mmR ammunition, which are identified as a portion of Defendant Property 11.

37.     Additional information provided by CENTCOM indicated that the 23 "Delavieh"

ATGMs, and the 578,400 rounds of 7.62x54mmR ammunition interdicted from *DHOW Z* by the

USS *Perry* were also manufactured by Iran's Defense Industries Organization.

## III.   DEFENDANT PROPERTY COLLECTIVELY SEIZED FROM MARITIME VESSELS *AL-GHAZAL 1*, *DHOW X*, *DHOW Y*, AND *DHOW Z*

38.     U.S. law enforcement has identified the following items, collectively seized from

the *Al-Ghazal 1*, *DHOW X*, *DHOW Y*, and *DHOW Z* as being subject to forfeiture:

a.     Approximately 8,911 "Type 56-1" Assault Rifles, which are described as Defendant Property 1;

b.     Approximately 35 "AKS-74U" Assault Rifles, which are described as Defendant Property 2;

c.     Approximately 298 "AKS20U" Carbine Rifles, which are described as Defendant Property 3;

d.     Approximately 19 "Type 80" GPMGs, which are described as Defendant Property 4;

e.     Approximately 265 "PKM"-Pattern GPMGs, which are described as Defendant Property 5;

f.     Approximately 100 "Type 85" Sniper Rifles, which are described as Defendant Property 6;

g.     Approximately 52 "AM-50" Anti-Materiel Rifles, which are described as Defendant Property 7;

h.  Approximately 194 "RPG-7"-Type Rocket Launchers, which are described as Defendant Property 8;

i.  Approximately 50 ATGMs ("AT-4 FAGOT" AND "AT-5 KONKURS" Variants), which are described as Defendant Property 9;

j.  Approximately 23 "DELAVIEH" ATGMs, which are described as Defendant Property 10; and

k.  Approximately 798,400 Rounds of 7.62x54mmR Ammunition, which are described as Defendant Property 11.

*See* Attachments 1-4.d (photographs of the Defendant Properties).

## COUNT ONE—FORFEITURE
### (18 U.S.C. § 981(A)(1)(G)(i))

39.  The United States incorporates by reference the allegations in the foregoing Paragraphs as if fully set forth herein.

40.  As described above, the Defendant Properties were part of a weapons smuggling scheme involving the IRGC.

41.  The Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as domestic and foreign assets of a designated foreign terrorist organization, the IRGC, which has and is engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5), against the United States, citizens, or residents of the United States.

42.  Alternatively, the Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i), as domestic and foreign assets affording any person (including without limitation the IRGC, the crew of the vessels, and the intended Yemeni recipients of the Defendant Properties) a source of influence over any such entity or organization, including the IRGC and the IRGC-QF.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that notice issue on the Defendant Properties as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Properties be forfeited to the United States for disposition according to law; and that the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:  July 6, 2023
      Washington, D.C.

                  Respectfully submitted,

                  MATTHEW M. GRAVES
                  United States Attorney
                  D.C. Bar No. 481052


By: _____*/s/ Stuart Allen*_____
           STUART D. ALLEN,
             D.C. Bar No. 1005102, N.Y. Bar No. 4839932
           BRIAN P. HUDAK
           RAJBIR DATTA
           ANNA D. WALKER
           Assistant United States Attorneys
           601 D Street, NW
           Washington, DC 20530
           (202) 252-7566 (main line)

           *Attorneys for the United States of America*

## <u>VERIFICATION</u>

I, Alan Poorman, a Special Agent with the Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 6th day of July 2023.


 */s/ Alan Poorman*
Special Agent Alan Poorman
Homeland Security Investigations

**ATTACHMENT 1**

On December 20, 2021, U.S. authorities seized 1,438 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1, and 220,000 rounds of 7.62x54mmR ammunition, which are identified as a portion of Defendant Property 11, from the *Al-Ghazal 1*.





**ATTACHMENT 1.a**

Example of Chinese-made "Type 56-1" assault rifle from the *Al-Ghazal 1*, which is a portion of Defendant Property 1.





**ATTACHMENT 1.b**

Example of the crates and cases of 7.62x54mmR ammunition from the *Al-Ghazal 1*, which are a portion of Defendant Property 11.



**ATTACHMENT 2**

On May 6, 2021, U.S. authorities seized 2,556 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1, 35 "AKS-74U Russian-made assault rifles, which are identified as Defendant Property 2, 194 Iranian-made "RPG-7" type rocket launchers, which are identified as Defendant Property 8, 19 Chinese-made "Type 80" GPMGs, which are identified as Defendant Property 4, 164 Iranian-made "PKM"-Pattern GPMGs, which are identified as a portion of Defendant Property 5, 100 Chinese-made "Type 85" sniper rifles, which are identified as a portion of Defendant Property 6, 52 Iranian-made "AM-50" anti-materiel rifles, which are identified as Defendant Property 7, and 50 Russian-made ATGMs further described as variants of the "AT-4 Fagot," and "AT-5 Konkurs" missile systems, which are identified as Defendant Property 9, from *DHOW X*.





**ATTACHMENT 2.a**

Example of the Chinese-made "Type 56-1" assault rifles from *DHOW X*, which are a portion of Defendant Property 1.







**ATTACHMENT 2.b**

Example of the cache of Iranian-made "RPG-7" type rocket launchers from *DHOW X*, which is Defendant Property 8.





**ATTACHMENT 2.c**

Example of the cache of Chinese-made "Type 80" GPMGs from *DHOW X*, which is Defendant Property 4.







**ATTACHMENT 2.d**

Example of the Chinese-made "Type 85" sniper rifles and Iranian-made "AM-50" anti-materiel rifle from *DHOW X*, which are Defendant Properties 6 and 7, respectively.





**ATTACHMENT 2.e**

Example of the cache of Russian-made ATGMs from *DHOW X*, which is Defendant Property 1.





## <u>ATTACHMENT 3</u>

On January 6, 2023, U.S. authorities seized 1,918 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1, and 198 Russian-made "AKS20U" carbine rifles, which are identified as a portion of Defendant Property 3, from *DHOW Y*.





**ATTACHMENT 3.a**

Example of the Chinese-made "Type 56-1" assault rifles from *DHOW Y*, which are a portion of Defendant Property 1.





## ATTACHMENT 3.b

Example of the Russian-made "AKS20U" carbine rifles from *DHOW Y*, which are a portion of Defendant Property 3.







**<u>ATTACHMENT 4</u>**

On January 15, 2023, U.S. authorities seized 2,999 Chinese-made "Type 56-1" assault rifles, which are identified as a portion of Defendant Property 1, 100 Russian-made "AKS20U" carbine rifles, which are identified as a portion of Defendant Property 3, 101 mostly Chinese-made "PKM"-Pattern GPMGs, which are identified as a portion of Defendant Property 5, 23 Iranian-made "Delavieh" ATGMs, which are identified as Defendant Property 10, and 578,400 rounds of 7.62x54mmR ammunition, which are identified as a portion of Defendant Property 11, from *DHOW Z.*





**ATTACHMENT 4.a**

Example of the Chinese-made "Type 56-1" assault rifles and Russian-made "AKS20U" carbine rifles, from *DHOW Z*, which are portions of Defendant Properties 1 and 3, respectively.









- 32 -

**ATTACHMENT 4.b**

Example of the Chinese-made "PKM"-Pattern GPMGs, from *DHOW Z*, which are a portion of Defendant Property 5.





**ATTACHMENT 4.c**

Example of the cache of Iranian-made "Delavieh" ATGMs, from *DHOW Z*, which is Defendant Property 10.



**ATTACHMENT 4.d**

Example of the cases of 7.62x54mmR ammunition, from *DHOW Z,* which are a portion of Defendant Property 11.



